Welch, J.
We see no error in the instructions of the court regarding the confession of the prisoner. The instructions given differ but a shade from those that were asked, the only difference being that those which were asked seem to deny to the jury the “ right” to judge for themselves, and in their own way, of the truth or falsehood of the exculpatory parts of the prisoner’s statements. We think the court rightly stated the rule of law, namely, that the whole statement is to be received as evidence, and that it is the province of the' jury, in the light of all the evidence in the case, to decide upon the truth or falsehood of the exculpatory parts of the statement.
Nor do we think the court erred in its instructions as to what constitutes the administering of poison, within the meaning of the first section of the crimes act.
To force poison down one’s throat, or to' compel him by •throats of violence to swallow, it, is an administering of poison. Neither deception nor breach of confidence is a necessary ingredient in the act. It matters not whether the poison be put into the hand, or into the stomach of the party whose life is to bes destroyed by it. If the poison reaches the stomach or body of the deceased, and does its work of death there, it is immaterial whether force or fraud was the means by which the guilty agent, effected his object. In either case it is an administering of poison, within the meaning of the act. We think counsel are wrong in assuming that the word administer always and necessarily implies “ service.” If it does, it often implies “ service ” to a very unwilling master. Such is the case when the law is administered to a criminal. The word minister ” is said to be derived from the same root as the Latin word manus, the hand. Etymologically, therefore, the word “ administer” would seem applicable to anything that could be done by the hand, to or for another. We think also that the court was right in instructing the jury, as in substance and effect it did, that it Í3 immaterial whether the party taking the poison took it willingly, intending thereby to commit suicide, or was overcome by, force, or overreached *163 by fraud. True, the atrocity of the crime, in a moral sense, would be greatly diminished by the fact that suicide was intended; yet the law, as we understand it, makes no discrimination on that account. The lives of all are equally under the protection of the law, and under that protection to their last moment. The life of those to whom life has become a burden — of those who are hopelessly diseased or fatally wounded — nay, even the lives of criminals condemned to death, are under the protection of the law, equally as the lives of those who are in the full tide of life’s enjoyment, and anxious to continue to live. If discriminations are to be made in such cases as to the amount of punishment due to offenders, they must be made by the exercise of executive clemency or legislative provision. Purposely and maliciously to kill a human being, by administering to him or her poison, is declared by the law to be murder, irrespective of the wishes or the condition of the party to whom the poison is administered, or the manner in which, or the means by which, it is administered. The fact that the guilty party intends also to take his own life, and that the administration of the poison is in pursuance of an agreement that both will commit suicide, does not, in a legal sense, vary the case. If the prisoner furnished the poison to the deceased for the purpose and with the intent that she should with it commit suicide, and she accordingly took and used it for that purpose ; or, if he did not furnish the poison, but was present at the taking thereof by the deceased, participating, by persuasion, force, threats, or otherwise, in the taking thereof, or the introduction of it into her stomach or body; then, in either of the eases supposed, he administered the.poison to her, within the meaning of the statute. Her act of taking and swallowing it, in his presence and by his direction, was his act of administering it.
It is said by counsel that suicide is no crime by the laws of Ohio, and that therefore there can be no accessories or principals in the second degree in suicide. This is true. But the real criminal act charged here is not suicide, but the *164 administering of poison. And to this criminal act theremay be accessories, and principals in the second degree. If I furnish poison to a guilty agent, an accomplice, to be administered by him, and he administers it accordingly, I am an accessory before the fact; and if I stand stand by and counsel or encourage him in the act of administering the poison to another, I am a principal in the second degree. But no question of this kind arises in the present case, either upon the indictment or in the evidence. There is no claim or pretense that there was any guilty third person participating' in the transaction. The charge is that the prisoner, as principal in the first degree, is guilty of administering poison, and thereby causing death.
We think, therefore, that the court did not err in its instructions as to what amounted to the administration of poison within the meaning of the crimes act.
It is also objected that, the court misdirected the jury as to the kind and amount of evidence necessary to prove the corpus delicti, or body of the crime. As we understand the charge of the court, it is, in substance, that extrajudicial confessions alone are not sufficient to prove the body of the crime, but that they may be taken and used for that purpose in connection with the other evidence in the cause. This we understand to be the law.
Another objection to the charge of the court is, that the jury were instructed that “in no case ought circumstantial evidence, where it is adequate to conviction, to be inferior to that which is derived from the testimony of a single witness.” It is difficult to see how this instruction could prejudice the plaintiff' in error. If it is wrong, it is wrong in his favor. It is, therefore, unimportant to inquire-whether the proposition be law or not.
The counsel also object to that part of the court’s charge which relates to the defense of insanity, and insist that, instead thereof, the court should have given certain instructions which they asked. We see no substantial difference between the instructions asked and the charge given. The form of question submitted to the jury is substantially *165 the same as laid down in Clark's case, 12 Ohio, 494 (note), and seems to ns to embody the true rule, namely: "Was the accused a free agent in forming the purpose to kill? "Was he at the time capable of judging whether that, act was right.or wrong? And did he know at the time that it was an offense against the laws of God and man?
It is also claimed that the court erred in refusing to reduce its charge to writing, and read the same to the jury, before the argument of the case. Her,e, again, we agree with the court below, and disagree with counsel. Under the provisions of the criminal code (S. & S. 553, 554, sec. 1), as we read them, the court is not bound to reduce its instructions to writing, unless requested so to do before the argument of the case, nor to read or deliver the same, when so written, until after the close of the argument^ if any argument is made. This is reasonable, the design evidently being to give the court time and opportunity, without unnecessary delay of the trial, to prepare the instructions, and is evidently what was intended by the section of the code referred to.
Another ground of error insisted upon, and which we think also unavailing, is the overruling of the prisoner’s motion for a new trial, based on the alleged ground that one of the jurors had formed and expressed his opinion in the case. The evidence in regard to the fact of such formation and expression of opinion is conflicting. It is enough to say, in order to uphold the ruling and judgment of the court, that there was evidence fairly tending to disprove the fact alleged, and that we have no power to revise the finding of the court as to that fact.
There is but one other ground of error which we deem it necessary to notice, and this, we incline to think, is well taken. I refer to the order of the court rejecting testimony offered to prove the predisposition of Mary Jane Lovell to suicide. The testimony was rejected on the ground of remoteness, referring, as it did, to a period six years prior to the time of her death. It seems to us that this lapse of dime should go merely to the weight, and not to the com *166 petency of the testimony. We can not assume that this-state of mind, this predisposition to suicide, was merely temporary. It was equally open to both parties to trace the history of her mind down to a more recent period; and we can not assume that the prisoner had the means of doing so, or see on what ground he was bound to make known his purpose to do so. For the error in rejecting this testimony, although apparently of but small importance in the case, we feel bound to reverse the judgment,, and remand the cause for retrial and further proceedings..
Other errors are assigned upon the record, but we deem it unimportant to consider them, further than to say that,, in our judgment, they are not well taken.

Judgment reversed and cause remanded.